## HICKS *v.* DISTRICT OF COLUMBIA.

No. 51. Argued October 21, 1965.—Decided February 28, 1966.

Reported below: See 197 A. 2d 154.

*Charles W. Wolfram* argued the cause for petitioner, *pro hac vice,* by special leave of Court. With him on the briefs were *Lawrence Speiser, Melvin L. Wulf* and *Monroe Freedman.*

*Hubert B. Pair* argued the cause for respondent. With him on the brief were *Chester H. Gray, Milton D. Korman* and *Ted D. Kuemmerling.*

PER CURIAM.

The writ of certiorari is dismissed as improvidently granted.

MR. JUSTICE HARLAN, concurring.

Among the several reasons which support the action of the Court in dismissing the writ in this case as improvidently granted, I rest my decision to join in this disposition on the lack of a record, without which I do not believe the constitutional issues tendered can properly be decided.

MR. JUSTICE DOUGLAS, dissenting.

I.

We granted certiorari in this case to consider what I think is an important question: the constitutionality of petitioner's conviction of "vagrancy." Relying on our determination that this case presented substantial ques-

tions of constitutional law, the parties comprehensively briefed those questions and we heard argument. But now the Court decides that the writ of certiorari must be dismissed as improvidently granted.

With all respect, I must dissent from this disposition of the case.

In the first place, the alleged "untimeliness" of the petition was called to the attention of the Court by respondent in its brief opposing the grant of certiorari. We were thus fully aware of this point when we granted the writ. Moreover, Rule 22 (2) is not jurisdictional or mandatory and may be waived by this Court under proper circumstances, at least where no jurisdictional statute is involved. *Heflin* v. *United States*, 358 U. S. 415, 418, n. 7. Having brought the case here, required the parties to brief the issues, and heard argument, it is most inappropriate to decline to exercise our discretion and waive the time bar of Rule 22 (2).[1]

Nor, in my opinion, is the objection to the adequacy of the record well founded. Petitioner argued in this Court that the statute defining "vagrant" is unconstitutionally vague. The challenged statute is § 22–3302 (3) of the District of Columbia Code, and it provides that a "vagrant" is:

> "Any person leading an immoral or profligate life who has no lawful employment and who has no

---

[1] The above assumes that Rule 22 (2) applies to this case. Our jurisdiction to review this decision is not based on 28 U. S. C. § 1254 (1) (1964 ed.) which we previously held did not permit review by writ of certiorari of cases where the Court of Appeals for the District of Columbia Circuit refused to allow an appeal. *Ferguson* v. *District of Columbia*, 270 U. S. 633. Our jurisdiction is founded on the power to issue a common-law writ of certiorari. *House* v. *Mayo*, 324 U. S. 42; 28 U. S. C. § 1651 (a) (1964 ed.). Arguably, Rule 22 (2) has no application in cases involving extraordinary writs. Rule 31 which governs the procedure on applications for extraordinary writs imposes no time limit.

lawful means of support realized from a lawful occupation or source."

We do not need a detailed account of the particular facts of this case in order to pass on the claim that this statute lacks the specificity that due process of law requires. In *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453, we said:

"If on its face the challenged provision is repugnant to the due process clause, specification of details of the offense intended to be charged would not serve to validate it. . . . It is the statute, not the accusation under it, that prescribes the rule to govern conduct and warns against transgression. . . . No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."

The Court held the challenged statute bad in that case without considering the defendant's conduct which formed the basis of the prosecution. If a penal statute is so imprecise as to deny fair warning to those who might transgress it, any conduct of the defendant prosecuted under it which might have been proscribed by a more precisely worded statute is irrelevant.

The *Lanzetta* case is close kin to the present one because the crime there charged was one of being a "gangster" which was defined as any person "not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime in this or in any other State." 306 U. S., at 452. The Court, without considering the facts of record, looked only at the statute and the charge of the indictment and ruled that the Act was unconstitutional for vagueness.

If one takes my view and approaches this case as an attempt by the Government to regulate the *status* of

being a vagrant, the absence of a detailed record is—as with the vagueness point—no impediment to proper analysis.

## II.

Our vagrancy laws stem from the series of the Statutes of Labourers (23 Edw. 3; 25 Edw. 3, Stat. I) first passed in 1349 and amended and modified from time to time over the next 200 years.[2] They reflected "the criminal aspect of the poor laws."[3] They "confined the labouring population to stated places of abode, and required them to work at specified rates of wages. Wandering or vagrancy thus became a crime."[4] History tells the story from the point of view of the Establishment: that wandering bands of people, who had left their masters, committed all sorts of crimes and hence must be punished for wandering. That philosophy obtains in this country, because

---

[2] III Stephen, History of the Criminal Law of England 203 *et seq.* (1883).

[3] *Id.,* at 266; see II Holdsworth, History of English Law 459–462 (1927). The purpose of these statutes was to offset the loss of workers and to check the rise in wages which resulted from the Black Death. Those able to work, and lacking other means of support were compelled to work, and at regulated wages. Workers were confined to their existing place of residence. Stephen suggests that the "object of this legislation was to provide a kind of substitute for the system of villainage and serfdom, which was then breaking down . . . ." Stephen, *op. cit. supra,* at 204. See also Kenny's Outlines of Criminal Law 411 (Turner ed. 1958). Early laws forbidding begging distinguished between beggars "able to serve or labor" and "beggars impotent to serve." See, *e. g.,* 12 Rich. 2, c. 7. Economic conditions changed; when work became scarce, laborers were forced to look elsewhere. The focus of the laws dealing with laborers shifted; the ban on migration became a preventive to keep a parish from being saddled with the needs of foreign paupers and idlers. "The vagrant came to be regarded rather as a probable criminal than as a runaway slave. He must be made to work or else be treated as a criminal." Stephen, *op. cit. supra,* at 274.

[4] Stephen, *op. cit. supra,* at 267.

the English statutes provided the seed of our vagrancy laws. Article IV, ¶ 1, of the Articles of Confederation assured the free inhabitants of each State, save "paupers, vagabonds, and fugitives from Justice," the privileges and immunities of citizenship of the several States, and the right of free ingress and egress to and from each State.

But there was incongruity in superimposing the English anti-migratory policy upon the law of America:

> "Vast movements of people motivated by urgent economic need settled this country from Europe, pushed settlement westward and fed growing cities from rural population reservoirs. England's Enclosure Acts, by withdrawing land from agricultural use, swelled the army of English vagrants; America invited migration with the lure of free land. The same elements of the population who on one side of the Atlantic were rogues and vagabonds, on the other were frontiersmen." [5]

America's vagrancy laws were expanded to cover a host of acts other than wandering—begging, drunkenness, disorderly conduct, loitering, prostitution, lewdness, narcotics peddling, and so on. They were justified here, as in early England, as devices of control. This Court, writing in 1837, said:

> "We think it as competent and as necessary for a state to provide precautionary measures against the moral pestilence of paupers, vagabonds, and possibly convicts; as it is to guard against the physical pestilence, which may arise from unsound and infectious articles imported, or from a ship, the crew of

---

[5] Foote, Vagrancy-Type Law and Its Administration, 104 U. Pa. L. Rev. 603, 617 (1956). And see Scott, Criminal Law in Colonial Virginia 272–275 (1930).

which may be labouring under an infectious disease."
*City of New York* v. *Miln,* 11 Pet. 102, 142–143.

The wanderer, the pauper, the unemployed—all were deemed to be potential criminals. As stated by the Court of Appeals for the District of Columbia Circuit in *District of Columbia* v. *Hunt,* 82 U. S. App. D. C. 159, 161, 163 F. 2d 833, 835, "A vagrant is a probable criminal; and the purpose of the statute is to prevent crimes which may likely flow from his mode of life." The vagrant, therefore, is not necessarily one who has committed any crime but one who reflects "a present condition or status." *Handler* v. *Denver,* 102 Colo. 53, 58, 77 P. 2d 132, 135. Cf. *Ex parte Branch,* 234 Mo. 466, 470–471, 137 S. W. 886, 887. That condition is not a failure to make a productive contribution to society, for the idle rich are not reached. The idle pauper is the target. Insofar as that status reflects pauperism it suggests the need for welfare; and insofar as it reflects idleness it suggests the need for the intervention of employment agencies. I do not see how under our constitutional system either of those elements can be made a crime. To do so serves the cause either of arrests and convictions on suspicion or of arrests and convictions of unpopular minorities (*Edelman* v. *California,* 344 U. S. 357, 366, dissenting opinion)—procedures very convenient to the police [6] but foreign to our system.

I do not see how economic or social status can be made a crime any more than being a drug addict can be. *Robinson* v. *California,* 370 U. S. 660, 668 (concurring opinion).[7] No overt act of criminal dimensions is charged

[6] Foote, *op. cit. supra,* n. 5, at 625 *et seq.*

[7] The volume of vagrancy cases in the courts each year is large. The most recent FBI Crime Reports show that in 1964, in 3,012 cities with populations exceeding 2,500, 125,763 vagrancy arrests were made (out of a total of 4,155,924 arrests for that same period). Uniform Crime Reports—1964, p. 120.

here.    Petitioner was either arrested on suspicion [8] or for innocent acts [9] which were used as a cloak for an arrest on grounds the police could not establish.    In either event the arrest and conviction were, in my view, unconstitutional.

## APPENDIX TO OPINION OF MR. JUSTICE DOUGLAS, DISSENTING.

### GUITARIST CONVICTION STIRS PROTEST

*By* STERLING SEAGRAVE

The Washington Post

June 14, 1963

Eddie Hicks, the 25-year-old Dupont Circle troubadour convicted of vagrancy because he spent his afternoons playing a guitar in Dupont Circle, was given a suspended sentence yesterday.

The American Civil Liberties Union announced it would appeal the Hicks case and attack the constitutionality of his conviction under the vagrancy statute.    The

---

[8] For the prevalency of arrests "on suspicion" or "for investigation" in the District of Columbia, see Report and Recommendations of the Commissioners' Committee On Police Arrests for Investigation (the Horsky Report), July 1962.

[9] He was either arrested for playing a guitar in a park (see Appendix) or for sleeping in a men's room (cf. Jean Valjean in Victor Hugo's Les Miserables), for the information reads as follows:

"Eddie J. Hicks late of the District of Columbia aforesaid, on or about the 19th day of May in the year A. D. nineteen hundred and sixty three, in the District of Columbia aforesaid, and on Dupont Circle north, west, was then and there, and has been since that day and still is a vagrant, to wit; a person leading an immoral and profligate life who has no lawful employment and who has no lawful means of support realized from a lawful occupation and source and who wanders abroad and lodges in a public park and public comfort stations, living upon the charity of others, and who lives idly and without any settled home, and otherwise leading a profligate life."

ACLU said the statute was unclear and was being used by police to persecute Hicks and others who were only enjoying themselves innocently in a public park.

The young troubadour was arrested by a Park Policeman Wednesday after being warned not to play his guitar in Dupont Circle. As a result, residents of the area and "regulars" in the park are protesting what they consider an invasion of their right to assemble in peaceful recreation.

Top officials of the Interior Department spoke out in favor of guitar playing and folk singing as a "wholesome activity that should not be disturbed but encouraged" in the Nation's public parks.

At the trial Wednesday, Park Policeman James E. Thomas told Judge Thomas C. Scalley that Hicks was unemployed. Hicks testified that he was only visiting Washington for a few weeks and that he had shown Thomas a $20 bill when the policeman had threatened to arrest him for vagrancy if he ever came back to Dupont Circle.

When he was arrested Wednesday, Hicks was sitting on a bench with a friend, his guitar in a case and money in his pocket, testimony showed.

At the sentencing yesterday, Judge Scalley told the minstrel that he was suspending sentence and that Hicks was free on "personal bond." The conviction went down on his record, however.

Reaction came swiftly. At Dupont Circle, angry sympathizers plotted a demonstration.

"If they are going to stick that boy with a vagrancy conviction just for playing a guitar, they're going to have to arrest several hundred of us. We've been playing guitars there for years," said one.

The regular habitues of Dupont Circle on any given day are neighborhood residents, retired folk, families who pause on a stroll in the summer sun, children who play

porpoise in the fountain, couples who doze on the grass, and students.

The students were priced out of Georgetown, moved to Foggy Bottom, then relocated to the Dupont Circle area when urban renewal closed Foggy Bottom to them.

They live for blocks around the Circle in low-rent rooming houses, studios and shared apartments. Most are poor, some are out of school temporarily to work evenings and part-time wherever they can find jobs.

Generally, they are clean-cut, neatly dressed in sports clothes, articulate, quiet and yet quick to take offense when they think civil authorities are breathing too closely on their necks.

When they can, they play chess in the Circle, around the fountain, argue age-old questions, or gather around the talented and untalented guitarists among them for spontaneous folk music sessions that quickly draw the interest and amusement of passers-by.

On recent Sundays, spontaneous "hootenannys" have started out of nothing, drawing small crowds which sat listening on the grass.

On May 19, Park Policemen routed the last hootenanny, sending everyone scurrying for cover. Attorney Arthur Neuman was passing by and snapped pictures.

"It was a peaceful, lawful assembly," Neuman said yesterday. "There was no disturbance and it was commendable and refreshing to see young people engaged in good social behavior rather than roaming the streets committing crimes."

Capt. Raymond S. Pyles, chief of the Third Precinct which includes the Circle, reported, "I cannot recall a single complaint about them."

Walter Pozen, assistant to Secretary of the Interior Stewart Udall, said, "Not only do I think they shouldn't be singled out—they should be encouraged. The parks are there for recreation and general use."

"There's no rule I know against playing in a park," said Conrad Wirth, director of the National Park Service. "I like music myself."

Charles Wolfram, the ACLU attorney who will champion Hicks when the case is appealed, said yesterday that his attack would be against three sections of the vagrancy statute.

The statute describes a vagrant as "immoral, profligate and dissolute (with) no lawful means of employment or support, without any settled home."

"First," Wolfram said, "the word 'dissolute' is so vague you can't tell what it forbids. Second, the statute discriminates against the poor and the unemployed. Third, it is used by police as carte blanche to harass anyone they personally dislike."

Looking back at the whole episode, attorney Neuman said, "If a man chooses to spend his life playing a guitar, who has the right to insist that he engage in some sort of servitude?"