Charles GOLDMAN, John Kirkland,
Plaintiffs,

v.

Robert KNECHT, Donald Vendell, Marvin
Nelson, Duke Dunbar, Rex Scott, David
Voorhis, Kelly Gaskill, and James
Smith, Defendants.

Civ. A. No. C–974.

United States District Court
D. Colorado.

Feb. 3, 1969.

Stevens & Miller, by Robert Bruce Miller and William Redak, Boulder, Colo., for plaintiffs.

Walter L. Wagenhals, City Atty., Boulder, Colo., and Aurel M. Kelly, Asst. Atty. Gen. for the State of Colorado.

Morgan Smith, Public Defender of Adams County, Brighton, Colo., amicus curiae.

Before BREITENSTEIN, Circuit Judge, and CHILSON and DOYLE, District Judges.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

The complaint in this case questions the constitutionality of the Colorado vagrancy statute, C.R.S.1963, § 40-8-19, as amended, and demands injunctive and declaratory judgment relief.

Plaintiffs have been and allegedly are being threatened with prosecution under this statute. In seeking relief in this Court, they invoke 28 U.S.C. § 1343(3) & (4), and, in essence, complain that the application of the Colorado statute to them violates rights guaranteed by the Fourteenth Amendment of the Constitution of the United States, together with the specified rights incorporated in that Amendment, and specifically set forth in the First, Fifth and other Amendments, commonly referred to as the Bill of Rights. The defendants are law enforcement officers of the County of Boulder, and include the Boulder District Attorney as well as the Attorney General of the State of Colorado.

Since the suit seeks injunctive relief against the actions of the officers of the State in the enforcement of the statute, a three-judge court has been constituted pursuant to 28 U.S.C. §§ 2281, 2284.

There has been an evidentiary hearing. Arguments have been heard, briefs have been filed, and the matter now stands submitted.

## I. JURISDICTION

Inasmuch as the case draws into question the validity under the Constitution of the United States of a state statute and seeks protection against its enforcement as to plaintiffs, we conclude that it is indeed an action which arises under the Constitution and laws of the United States, and that we have jurisdiction to hear and determine it. The case is also a proper one for convening a three-judge district court because it

seeks injunctive relief against the enforcement or execution of a state statute.[1]

## II. FACTUAL BACKGROUND

The statute which is here under attack defines a vagrant as a person able to work in an honest and respectable calling, who is found loitering or strolling about, frequenting public places where liquor is sold, begging or leading an idle, immoral or profligate course of life, or not having any visible means of support. It calls for imprisonment not to exceed ninety days, together with hard labor, and further provides that if a prisoner refuses to work he may be put in irons and kept on bread and water until he shall comply with this requirement of work.[2]

We have before us a transcript of the prosecution of the defendants in the County Court of Boulder County, and also a transcript of a habeas corpus proceeding before the District Court of the Judicial District of which the County of Boulder is a part. In the latter proceedings, the plaintiffs' writ of habeas corpus was granted and charges were not filed. In the former proceedings, however, the defendants were convicted of vagrancy and were sentenced and appealed. At the present time, this appeal is before the District Court in and for the County of Boulder. We are told that the appeal is not being processed and that the case is in a somewhat dormant state.

The State Court transcripts have been received and are considered not for the purpose of reviewing the evidence for legal sufficiency, but, rather, as showing the relationship of plaintiffs to the enforcement of the statute. These facts also serve to give some character to the present case, revealing as they do the use and effect of the statute in actual cases.

At the time of their first arrest on June 21, 1968, the plaintiffs were neither "loitering" nor "strolling about." The evidence establishes that they were doing nothing. The arrest occurred in a basement apartment, a place described as a hippie hangout or hippie haven. Although the officers who entered the apartment did not have a warrant, they were invited inside and were allowed to search for narcotics. The defendants were arrested on suspicion of violating the narcotics laws, but narcotics charges were not filed and all of the occupants of the apartment, except the two plaintiffs, were subsequently released.

When the police entered the apartment there were approximately ten people present. Some of them were engaged in cleaning the apartment, but most of them

---

1. A three-judge court is required when the constitutional question raised is substantial, the complaint at least formally alleges a basis for equitable relief and the case presented otherwise comes within the requirements of 28 U.S.C. § 2281. Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962). These criteria are definitely met here. However, the writer is authorized to say for Judge Chilson that he would have disposed of the case on the same basis as this three-judge court if he had heard the case as a single-judge court.

2. "Any person able to work and support himself in some honest and respectable calling, who shall be found loitering or strolling about, frequenting public places, or where liquor is sold, begging or leading an idle, immoral or profligate course of life, or not having any visible means of support, shall be deemed a vagrant, and may be arrested and brought before the county court. The judge shall examine such person and hear testimony in relation to such person, and if satisfied that such person is a vagrant, may impose a fine of not less than twenty-five nor more than two hundred dollars, or imprison such person in the county jail not less than ten nor more than ninety days, or both such fine and imprisonment and such person may be made to work out such fine and costs by hard labor upon the highways of the county. Such prisoner shall be credited with the sum of two dollars per day for each day of eight hours' labor, towards the payment of such fine and costs. In case such prisoner shall refuse to work, he may be put in irons and kept on bread and water until he shall comply with such requirements." 1963 C.R.S. § 40–8–19.

were merely sitting in the room talking. Apparently, the basis for singling out plaintiffs for the filing of the charges was their inability to furnish any identification, together with their complete lack of funds. Also, plaintiffs were then "residing" in places other than the place of arrest.

Vagrancy charges were filed against the plaintiffs in the Boulder County Court, and they were tried and convicted on August 21, 1968. Their attorneys brought the constitutional issues to the attention of the trial court both before and during the subsequent trial. The county judge expressed intent to find the statute constitutional regardless of argument to the contrary. Trial was had to a jury and guilty verdicts were returned. On the same day the defendants were sentenced to thirty days in jail.[3] They appealed these convictions to the District Court, but as of this date no action has been taken on this appeal. The present action has been pending since before this trial, and conceivably the appeal is in abeyance pending the outcome of the present proceeding.

The second arrest occurred on August 13, 1968, at a mountain camp near Boulder. The police had gone to this camp to execute a search warrant. They were seeking narcotics and dangerous drugs, but did not find any which could be linked to plaintiffs. Nevertheless, twenty-four persons were arrested and ten of these, including plaintiffs, were held. The police, as shown by the habeas corpus transcript, decided who should be released and who should be held to face vagrancy charges. It also appeared that narcotics were found in connection with

this raid, but it was impossible for the officers to connect any of the arrested persons to the contraband.[4] Following a habeas corpus hearing, the District Court issued the writs and released the plaintiffs. This case has not been pursued further.

The defendants do not dispute that this Court has jurisdiction to hear and determine the case. Nor do they question that it is a proper situation for convening a three-judge district court. Their main argument is that in the exercise of our discretion we should abstain from deciding it. In the alternative, they contend that the statute is not in violation of the Federal Constitution.

## III. THE ABSTENTION QUESTION

■ Defendants argue that main elements of the abstention doctrine are present. These were first enunciated in Railroad Commission of Texas v. Pullman Company, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and are: (1) avoidance of an unnecessary or premature decision of the Federal-Constitutional question, and (2) avoidance of unnecessary friction in federal-state relationships. Defendants concede that both elements must be present, but say that the case can be decided on state grounds and that we should stay proceedings to give the state court an opportunity to determine the merits of the case.

The plaintiff in *Pullman* was seeking to enjoin enforcement of an order of the Texas Railroad Commission, claiming that the order denied its rights under the Fourteenth Amendment, and that under Texas law the Commission lacked author-

---

3. In passing sentence, the Boulder County Judge specifically denied credit for time already spent in jail. Kirkland had spent forty-five days in jail before posting bond, while Goldman had spent ten days in jail before he was able to do so.

4. When asked why he was holding the defendants, one of the officers said:
 "The Sheriff of this county is charged with the responsibility of the protection and well-being of personal property and

the lives of its citizens. Certainly the conditions of that camp, plus the complaints that we received from area residents, that live in the area, would indicate very definitely that we had to take some action of some kind. I venture to say when these boys were put in jail they had the first bath and the first square meal they've had in a long, long time; and that is immaterial."

ity to make the order in question. It is clear in that case that the federal court had power to decide not only the constitutional question, but also the ancillary state issues. Nevertheless, the Supreme Court held that it was the better part of wisdom to refrain from deciding the case. The Court unanimously held that the federal court of equity, under the circumstances there present, should avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication. The trial court was ordered to abstain from deciding the case, but to retain jurisdiction until the parties had had an opportunity to obtain from the state court a decision on the state issues involved. Thus it turned on the proposition that there were ancillary state issues which could determine the case, hence no necessity for then deciding the federal questions.

 Since the *Pullman* decision, the Supreme Court has applied the abstention doctrine in a wide variety of cases.[5] It has also tended in recent years to severely restrict and discourage the application of this principle.[6] It cannot be said though that there are any clear criteria other than the susceptibility of the statute to state construction or state law which will avoid a constitutional decision. Like other equity evaluations each case is examined and such things as the importance of the right, together with the seriousness of the threatened injury are considered. The area of discretion is by no means broad. Both the decisions and the language of the cases emphasize this. In Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391 (1967), the Supreme Court observed that "[t]he judge-made doctrine of abstention * * sanctions [an] escape [from federal courts] only in narrowly limited 'special circumstances'" 389 U.S. at 248, 88 S.Ct. at 395, and it is not to be ordered unless the state statute "is of an uncertain nature and is obviously susceptible of a limiting construction." 389 U.S. at 251 n. 14, 88 S.Ct. at 397 n. 14. In County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959), it was stated that "[a]bdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." 360 U.S. at 188–189, 79 S.Ct. at 1063.

 The Colorado vagrancy statute is not susceptible to a construction which could allow it to stand. It is afflicted with severe vagueness as well as overbreadth; it would violate the Constitution regardless of a narrowness of construction. Words such as loitering or strolling, frequenting public places, or where liquor is sold, etc., do not lend themselves to a limiting construction. The uncertainty and ambiguity persist regardless of the construction. The circumstances which will invariably give rise to arrest and prosecution are left to the discretion of the individual enforcing officer. Thus the manner of enforcement will always depend on the officer's

5. See, e. g., Harrison v. N. A. A. C. P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959); Government and Civic Employees Organizing Committee, C.I.O. v. Windsor, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957); Leiter Minerals, Inc. v. United States, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957); American Federation of Labor v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873 (1946); Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944).

6. See, e. g., Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967);

Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964); Griffin v. County School Bd., 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

subjective reactions to the conduct which he observes. We do not say that this is its only vice, but this aspect is adequate to dispose of the abstention issue. Where, as here, a state statute is so indefinite on its face that state court construction could not possibly avoid or fundamentally alter the constitutional issues raised in the litigation, the case is not one for abstention.[7] In such circumstances, it is the duty of a federal court to exercise its properly invoked jurisdiction and decide the federal questions.[8]

Defendants also maintain that we should stay our hand so as to allow the state courts to first pass on the constitutional question. But abstention does not call for this. As was said in Zwickler v. Koota, *supra:*

"In McNeese v. Board of Education, 373 U.S. 668 [83 S.Ct. 1433, 10 L.Ed. 2d 622], we again emphasized that abstention cannot be ordered simply to give state courts the first opportunity to vindicate the federal claim. After examining the purposes of the Civil Rights Act, under which that action was brought, we concluded that '[w]e would defeat those purposes if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court.' 373 U.S. at 672 [83 S.Ct. 1433, at 1436]. For the 'recognition of the role of state courts as the final ex-

positors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law.' England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 415–416 [84 S.Ct. 461, 465, 11 L. Ed.2d 440]." 389 U.S. at 251–252, 88 S.Ct. at 397.

■ We conclude that there is here no room for the exercise of discretion. The case falls short of satisfying the abstention criteria and, hence, this contention of defendants must be rejected.

## IV. CONSTITUTIONALITY OF COLORADO'S VAGRANCY STATUTE

■ Vagrancy is a crime directed to the person of the accused rather than to his behavior. It punishes him for his condition or state of being rather than for acting or failing to act.[9] Vagrancy control dates back to the fourteenth century and has been used at various times to advance economic, social and moral objectives. Initially vagrancy was conceived as an economic measure which sought to shore up the crumbling structure of feudal society by prohibiting mobility among the laboring class.[10] Vagrancy statutes subsequently were used in post-feudal society as a means of protecting a local community from the financial burdens and potential criminality of undesirable strangers.[11] The first Amer-

---

7. Zwickler v. Koota, 389 U.S. at 251 n. 14, 88 S.Ct. 391; Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177 (1965); Harrison v. N. A. A. C. P., 360 U.S. 167, 79 S.Ct. 1025 (1959); County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 79 S.Ct. 1060 (1959).

8. Harman v. Forssenius, 380 U.S. 528, 534–535, 85 S.Ct. 1177 (1965); United States v. Livingston, 179 F.Supp. 9, 12–13 (D.So.Car.1959), aff'd 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960). We have considered the Colorado rule [116(b) (1)] which allows questions of state law to be certified to the Colorado Supreme Court. Since our problem is not a question calling for state court decision, the rule cannot be utilized.

9. Handler v. City and County of Denver, 102 Colo. 53, 58, 77 P.2d 132, 135 (1938). See Lacey, Vagrancy and Other Crimes of Personal Condition, 66 Harv.L.Rev. 1203, 1204 (1953); McClure, Vagrants, Criminals and The Constitution, 40 Den. L.C.J. 314 (1963).

10. Lacey, supra at 1206; Rosenheim, Vagrancy Concepts in Welfare Law, 54 Cal. L.Rev. 511, 512–13 (1966).

11. President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Courts 102–03 (1967); see Douglas, Vagrancy and Arrest on Suspicion, 70 Yale L.J. 1, 5

ican vagrancy legislation, much of which still remains on the books,[12] reflected this philosophy.[13] However, because such restrictions on mobility clearly contravene the right to travel freely,[14] whatever justification that remains for vagrancy statutes is based upon crime prevention.[15] This justification assumes that the so-called vagrant mode of life exemplified by idleness and pauperism breeds criminality[16] Regardless of the truth of such assumptions,[17] vagrancy statutes, like all criminal statutes, must meet minimum constitutional requirements.

### A. Vagueness and Overbreadth Question

 The statute in question is subject to constitutional attack on several grounds, but its main deficiency (as has been noted) is its extreme breadth and vagueness. These qualities render it void on its face and, thus, in violation of the due process clause of the Fourteenth Amendment. Precision sufficient to give notice of proscribed conduct must be present, and this is especially so in a criminal statute affecting as it does constitutional freedoms. Aptheker v. Secretary of State, 378 U.S. 500, 514, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). It is, of course, a fundamental constitutional principle that a statute which forbids an act "in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."[18] The constitutional vice of a vague or indefinite statute is that it "fails to give a

(1960); Foote, Vagrancy-Type Law and its Administration, 104 U.Pa.L.Rev. 603, 615–16 (1956). A widespread fear of gypsies was also influential in this use of the anti-migratory provisions of the vagrancy laws. Rosenheim, *supra* at 516.

12. Sherry, Vagrants, Rogues and Vagabonds—Old Concepts in Need of Revision, 48 Cal.L.Rev. 557, 560–61 (1960); see Foote, *supra* at 616; Lacey, *supra* at 1206.

13. Hicks v. District of Columbia, 383 U.S. 252, 255–256, 86 S.Ct. 798, 799–800, 15 L.Ed.2d 744 (1966) (dissenting opinion). Paupers and vagabonds were excepted from the privileges and immunities clause of the Articles of Confederation. Foote, *supra* at 616. In City of New York v. Miln, 36 U.S. (11 Pet.) 102, 9 L.Ed. 648 (1837), the Supreme Court noted:
"We think it as competent and as necessary for a State to provide precautionary measures against the moral pestilence of paupers, vagabonds, and possibly convicts, as it is to guard against the physical pestilence which may arise from unsound or infectious articles imported, * * *." 36 U.S. (11 Pet.) at 143.

14. See, e. g., Edwards v. California, 314 U.S. 160, 177, 62 S.Ct. 164, 168, 86 L. Ed. 119 (1941); Douglas, *supra* at 2; Foote, *supra* at 623–24.

15. See, e. g., Douglas, *supra* at 11; Lacey, *supra* at 1206; Perkins, The Vagrancy

Concept, 9 Hastings L.J. 237, 252–53 (1958); McClure, *supra* at 320; McKay, Poverty and the Administration of Criminal Justice, 35 Colo.L.Rev. 323, 324 (1963).

16. See, e. g., District of Columbia v. Hunt, 82 U.S.App.D.C. 159, 163 F.2d 833, 835 (1947); Dominguez v. City and County of Denver, 147 Colo. 233, 363 P.2d 661, 663 (1961); Wallace v. State, 224 Ga. 255, 161 S.E.2d 288, 291 (1968); People v. Pieri, 269 N.Y. 315, 323, 199 N. E. 495, 498 (1936); State v. Harlowe, 174 Wash. 227, 233, 24 P.2d 601, 603 (1933); Douglas, *supra* at 6; Foote, *supra* at 627.

17. Professor Foote has questioned the validity of such correlations. Foote, *supra* at 627–28.

18. Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). See, e. g., Giaccio v. Pennsylvania, 382 U.S. 399, 402–403, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966); United States v. Harriss, 347 U.S. 612, 74 S. Ct. 808, 98 L.Ed. 989 (1954); Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948); Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939); United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921); International Harvester Co. of America v. Kentucky, 234 U.S. 216, 34 S.Ct. 853, 58 L.Ed. 1284 (1914).

person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."[19] Such a statute fails to establish reasonable standards for determining guilt or innocence thus licensing the police, jury and judge to create their own standards.[20]

The statute in question subjects to arrest, imprisonment and fine essentially every able-bodied citizen of Colorado who happens, at one time or another, to be "doing" one of the inherently innocuous acts or things mentioned. Because of this, it fails to give a person of ordinary intelligence the slightest warning as to what behavior is prohibited or as to standards which are to be used in his arrest and conviction. Mr. Justice Frankfurter's characterization of vagrancy statutes in Winters v. New York, 333 U.S. 507, 68 S.Ct. 665

(1948) serves to describe the Act which is now before us:

"These statutes are in a class by themselves, in view of the familiar abuses to which they are put. See Note, 47 Col.L.Rev. 613, 625. Definiteness is designedly avoided so as to allow the net to be cast at large, to enable men to be caught who are vaguely undesirable in the eyes of the police and prosecution,* although not chargeable with any particular offense. In short, these 'vagrancy statutes,' * * * are not fenced in by the text of the statute or by the subject matter so as to give notice of conduct to be avoided." 333 U.S. at 540, 68 S.Ct. at 682.[21]

The first element of this statute, ability to work, does not specifically require that the person be unemployed. Even one who has a job and who thus has proven ability to work and support himself may be subject to the proscribed acts. While it is not likely that such a

---

19. United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 812 (1954). See, e. g., Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L. Ed.2d 285 (1961); Raley v. Ohio, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959); Jordan v. DeGeorge, 341 U.S. 223, 230–232, 71 S.Ct. 703, 95 L.Ed. 886 (1951); Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618 (1939); Ricks v. District of Columbia, 37 Law Week 2367 (D.C.Cir. 1968); Smith v. Hill, 285 F.Supp. 556 (D.No.Carolina 1968); Baker v. Bindner, 274 F.Supp. 658, 662 (D. Ky.1967).

20. See, e. g., Watkins v. United States, 354 U.S. 178, 208, 77 S.Ct. 1173, 1 L. Ed.2d 1273 (1957); Boyce Motor Lines v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952); Musser v. Utah, 333 U.S. 95, 68 S.Ct. 397, 92 L. Ed. 562 (1948); Herndon v. Lowry, 301 U.S. 242, 263, 57 S.Ct. 732, 81 L.Ed. 1066 (1937); Smith v. Hill, 285 F.Supp. 556, 562 (1968). A statute without reasonable standards is "susceptible of sweeping and improper application," N. A. A. C. P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405

(1963), and furnishes a convenient tool for "harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure." Thornhill v. Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 742, 84 L. Ed. 1093 (1940).

21. This nebulous, open-ended, dragnet character of vagrancy statutes has been, in recent years at least, severely criticized by a number of commentators. See President's Commission on Law Enforcement and Administration of Justice, Task Force Report, The Courts 103–104 (1967); McKay, Poverty and the Administration of Criminal Justice, 35 U. of Colo.L.Rev. 323, 324–326 (1963); McClure, Vagrants, Criminals and the Constitution, 40 Den.L.C.J. 314 (1963); Douglas, Vagrancy and Arrest on Suspicion, 70 Yale L.J. 1 (1960); Sherry, Vagrants, Rogues and Vagabonds—Old Concepts in Need of Revision, 48 Cal. L.Rev. 557 (1960); Foote, Vagrancy–Type Law and its Administration, 104 U.Pa.L.Rev. 603 (1956); Lacey, Vagrancy and Other Crimes of Personal Condition, 66 Harv.L.Rev. 1203 (1953); Note, The Vagrancy Concept Reconsidered: Problems and Abuses of Status Criminality, 37 N.Y.U.L.Rev. 102 (1962).

person would be charged, this fact demonstrates the wide range of conditions which can give rise to violations of the terms at least of the statute. Language which tolerates such unfettered individual construction and enforcement plainly violates the Constitution of the United States.[22]

Equally uncertain are the phrases "honest and respectable calling" and "support himself." These are subject to a vast variety of conditions. What level of support is sufficient to permit one to escape the embrace of the statute?

The words "loitering or strolling about" do not call to mind conduct which is in and of itself immoral and antisocial. Conceivably, loitering or strolling on public property which obstructs the orderly government process would be offensive, and conceivably loitering and strolling about, when coupled with preparation to commit a criminal offense or with interference with the activities of others, might be within the scope of legislative prohibition, but the statute does not require the loitering or strolling to be associated with any other conduct. In Ricks v. District of Columbia, note 22 *supra*, the Court said:

"[E]videncing the susceptibility of the statutory language to divergent understandings, witnesses at appellant's trial likewise voiced widely differing interpretations of 'loitering,' ranging from the ostensibly innocent to the potentially criminal. In the complete absence of statutory criteria by which the one can be objectively distinguished from the other, we find a fatal constitutional flaw. * * *"

Territory of Hawaii v. Anduha, 48 F.2d 171, 173 (9th Cir. 1931), defined loiter as: "To consume (time) idly; with away, as, to loiter away the hours; to linger idly along the way; to spend time idly; to be dilatory; delay; to travel indolently with frequent intermissions." It defined idle as: "To spend in idleness; waste; with away,

as, to idle away an hour; to spend or lose time in inaction or without employment." The court went on to hold the statute unconstitutional—saying that it was too broad and that by its very nature it would be enforced in a discriminating way.

The clause "frequenting public places, or where liquor is sold" is also overly broad. A person able to support himself, who frequents public places, or where liquor is sold, is subject to arrest. This then like the other prohibited conduct, though not so vague as some of the words, nevertheless leaves a full and unlimited discretion to the enforcing officials. The same is true of the terms "begging or leading an idle, immoral, or profligate course of life." While the term "begging" is sufficiently clear, the remaining clause "leading an idle, immoral, or profligate course of life" is subject to the determination of the officer and his ideas as to what constitutes idle, immoral, or profligate. These terms have been condemned in Territory of Hawaii v. Anduha, *supra*, and Ricks v. District of Columbia, *supra*.

Finally, the clause "not having any visible means of support" is unconstitutionally vague, since it is impossible for any person to be forewarned as to what he must display in order to possess visible means of support. Such a prohibition has also been held invalid. Alegata v. Commonwealth, Mass., 231 N.E.2d 201, 206–207 (1967); Fenster v. Leary, 20 N.Y.2d 309, 282 N.Y.S.2d 739, 229 N.E.2d 426 (1967); Smith v. Hill, 285 F.Supp. 556, 560 (E.D.No. Carolina 1968). In the *Fenster* case the words were condemned on a substantive basis. Again, in Smith v. Hill, *supra*, the District Court for the Eastern District of North Carolina held invalid a statute containing such words and said:

"No definition of * * * 'visible means of support' is provided or available. There is no rule of conduct in or on the face of the ordinance. It is

22. Ricks v. District of Columbia, 37 Law Week 2367 (1968). See note 20 and accompanying text.

difficult if not altogether impossible for any citizen (or other person for that matter) to determine what behavior, or failure to observe what code of behavior, will render him criminal as a vagrant, a tramp, a person under suspicion. The ordinance sweeps so broadly that it may be invoked, at the whim of the authorities, against every member of the community who is not living in the style to which the particular authorities set as a standard. Prosecution and conviction depend upon a judge's subjective determination that a man is a vagrant or a tramp—terms of no fixed meaning; or that he arouses suspicion and lacks whatever visible means of support are deemed sufficient to satisfy the current unexpressed, unexpressable official standards for mandatory affluence." 285 F.Supp. at 560.

In summary then, the statute is void regardless of whether it is comprehensively or specifically considered. Selection of violators will necessarily be an arbitrary process based on the personal views of the arresting officer or the philosophy of the court hearing the case.[23] An enactment which is devoid of precise definition does not satisfy our basic notion that government must be by law and not by the whim of man.

### B. Equal Protection

The statute also violates the equal protection clause of the Fourteenth Amendment prohibiting discrimination between classes of persons, and requiring legislative classifications to be reasonable.[24] To fulfill this demand a statute must include within the categories created "all persons similarly situated with respect to the purpose of the law." [25] However rationalized, the classification used in the Colorado vagrancy statute is arbitrary. It assumes that idleness and poverty are invariably associated with criminality. In this leisure time-early retirement era, such an assumption is patently unfounded.[26] But assuming that some vagrants are criminals, the classification is nevertheless unreasonable because it punishes all vagrants as

23. See Shuttlesworth v. City of Birmingham, 382 U.S. 87, 90, 86 S.Ct. 211, 15 L. Ed.2d 176 (1965) ; Cox v. Louisiana, 379 U.S. 536, 579, 85 S.Ct. 453, 13 L. Ed.2d 471 (1965) (separate opinion of Mr. Justice Black).

In *Shuttlesworth,* the Court observed:

"Literally read, therefore, the second part of this ordinance says that a person may stand on a public sidewalk in Birmingham only at the whim of any police officer of that city. The constitutional vice of so broad a provision needs no demonstration." 382 U.S. at 90, 86 S.Ct. at 213.

While in *Cox,* Mr. Justice Black poignantly observed that

"[i]n the case before us Louisiana has by a broad, vague statute given policemen an unlimited power to order people off the streets, not to enforce a specific, nondiscriminatory state statute forbidding patrolling and picketing, but rather whenever a policeman makes a decision on his own personal judgment that views being expressed on the street are provoking or might provoke a breach of the peace. * * * This kind of statute provides a perfect device to arrest people whose views do not suit the policeman or his superiors, while leaving free to talk anyone with whose views the police agree." 379 U.S. at 579, 85 S.Ct. at 469.

24. Hoyt v. Florida, 368 U.S. 57, 60, 82 S.Ct. 159, 161, 7 L.Ed.2d 118 (1961) ; Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ; Note, The Vagrancy Concept Reconsidered: Problems and Abuses of Status Criminality, 37 N.Y.U.L.Rev. 102, 125 (1962).

25. Tussmen and tenBroek, The Equal Protection of the Laws, 37 Calif.L.Rev. 341, 346 (1949).

26. See Note, 37 N.Y.U.L.Rev. 102, at 119–21. The authors concluded:

"[T]here is no theoretical necessity nor probability that persons assuming a vagrant status are future criminals. Available evidence based upon experience has also demonstrated the weakness of this purported causal link." Note at 126–27. See also authorities cited in notes 15, 16 and 17, *supra.*

future criminals despite the fact that many never resort to criminality.[27] It is also noteworthy that this vagrancy statute, because of its vast scope, invites arbitrary enforcement. This makes selective enforcement virtually inevitable.[28] Certain sub-classes of individuals within the general vagrancy statutes are certain to become the targets of selective enforcement.[29] It is therefore apparent that the Colorado vagrancy statute offends the equal protection clause of the Fourteenth Amendment.

## C. Substantive Due Process
### —Legislating Status

A third area of constitutional vulnerability is the legislative effort to create a crime out of status or condition as opposed to behavior. The more recent decisions of the Supreme Court have focused attention on and have condemned legislative efforts of this kind. Perhaps the most significant of the recent deci-

sions is that in Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), in which the state had attempted to make it a crime to be addicted to narcotics. In the opinion of the Court, which was written by Mr. Justice Stewart, a distinction was drawn between conduct and status. The effort to declare status a crime was unequivocally condemned. The opinion notes that narcotic addiction is an illness and adds:

"We hold that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment. To be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. But the question cannot be considered in the abstract. Even one day in prison would

27. McClure, *supra:*
"[S]ome vagrants are future criminals; some vagrants are not future criminals; and some future criminals are not vagrants. It is the over-inclusive aspect of these statutes which renders them 'unreasonable,' and therefore unconstitutional. Granting that some vagrants are future criminals, some are not, and undoubtedly a great many future criminals are not, and never have been, vagrants. By reaching out and including individuals who will never be future criminals, the argument goes, the statutes over-step the bounds of reasonable class legislation." McClure, *supra* at 333–34. See also Tussman and tenBroek, *supra* at 347–53.

28. See Edelman v. California, 344 U.S. 357, 359, 73 S.Ct. 293, 295, 97 L.Ed. 387 (1953); Note, 37 N.Y.U.L.Rev. 102, at 131–32; cf. Hicks v. District of Columbia, 383 U.S. 252, 256, 86 S.Ct. 798, 800 (dissenting opinion).

29. In Fenster v. Leary, *supra*, the Court noted:
"It is also obvious today that the only persons arrested and prosecuted as common-law vagrants are alcoholic derelicts and other unfortunates, whose only crime, if any, is against themselves, and whose main offense usually consists in

their leaving the environs of skid row and disturbing *by their presence* the sensibilities of residents of nicer parts of the community, or suspected criminals, with respect to whom the authorities do not have enough evidence to make a proper arrest or secure a conviction on the crime suspected." 282 N.Y.S.2d at 744, 229 N.E.2d at 430.
See also Douglas, *supra* at 9; Foote, *supra* at 628; McKay, *supra* at 324. Minority groups have received disproportionate attention, Note, 37 N.Y.U.L.Rev. 102, at 132, and vagrancy statutes have been used both to harass known criminals, Douglas, *supra* at 9; and to banish nonresident vagrants, see Foote, *supra* at 607–09. Recently, these statutes have been used to control members of the so-called "hippie" movement. See Hughes v. Rizzo, 282 F.Supp. 881 (E.D.Pa.1968). Such selective enforcement usually results in the invidious situation where only moneyless, rootless citizens are prosecuted. Territory of Hawaii v. Anduha, *supra* 48 F.2d at 173 (dictum); McKay, *supra* at 324. In effect, this enforcement creates a classification based upon poverty and is clearly unconstitutional. Hicks v. District of Columbia, *supra* (dissenting opinion); Fenster v. Leary, *supra* (dictum): McKay, *supra* at 324.

be a cruel and unusual punishment for the 'crime' of having a common cold." 370 U.S. at 667, 82 S.Ct. at 1420–1421.

The thrust and effect of the *Robinson* case became even more clear in the Supreme Court's very recent pronouncement in Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968). There, the constitutionality of a Texas statute making public intoxication a criminal offense was upheld. *Robinson* was *distinguished* because it had to do with pure status as opposed to conduct or behavior.[30]

If addiction to narcotics is a status which the legislature cannot validly declare to be a crime under *Robinson,* it follows that the Colorado attempt to declare idleness or indigency coupled with

being able-bodied must also (indeed even more) be held beyond the power of the state legislative body. The statute, in part at least, does not require either act or behavior.[31] It deals with condition.[32] Therefore, insofar as the statutory prescription seeks to legislate against status, it is in conflict with the substantive due process limitation of the Fourteenth Amendment. Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145 (1968); Robinson v. United States, 360 U.S. 660, 82 S.Ct. 1417 (1962); see also Edwards v. California, 314 U.S. 160, 62 S.Ct. 164 (1941).

## V.

We have further concluded that the *necessity* for injunctive relief has not been demonstrated, but that the plain-

---

**30.** In the majority opinion Justice Marshall wrote:

"The entire thrust of *Robinson's* interpretation of the Cruel and Unusual Punishment Clause is that criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some *actus reus.*" 392 U.S. at 533, 88 S.Ct. at 2154–2155.

In a concurring opinion, Justice Black concluded:

"A different question, I admit, is whether our attempt in *Robinson* to limit our holding to pure status crimes, involving no conduct whatever, was a sound one. I believe it was. Although some of our objections to the statute in *Robinson* are equally applicable to statutes that punish conduct 'symptomatic' of a disease, any attempt to explain *Robinson* as based solely on the lack of voluntariness encounters a number of logical difficulties. Other problems raised by status crimes are in no way involved when the State attempts to punish for conduct, and these other problems were, in my view, the controlling aspects of our decision.

"Punishment for a status is particularly obnoxious, and in many cases can reasonably be called cruel and unusual, because it involves punishment for a mere propensity, a desire to commit an offense; the mental element is not simply one part of the crime but may constitute all of it. This is a situation universally sought to be avoided in our

criminal law; the fundamental requirement that some action be proved is solidly established even for offenses most heavily based on propensity, such as attempt, conspiracy, and recidivist crimes." 392 U.S. at 542–543, 88 S.Ct. at 2159.

**31.** A person violates C.R.S. (1963) § 40–8–19 by being "able to work and support himself" and being "without visible means of support." The constitutional objections to imposing criminal sanctions on mere economic status were predicted in Edwards v. California, 314 U.S. 160, 62 S.Ct. 164 (1941). There Justice Jackson (concurring) wrote:

"We should say now, and in no uncertain terms, that a man's mere property status, without more, cannot be used by a state to test, qualify, or limit his rights as a citizen of the United States. 'Indigence' in itself is neither a source of rights nor a basis for denying them. The mere state of being without funds is a neutral fact—constitutionally an irrelevance, like race, creed or color." 314 U.S. at 184–185, 62 S.Ct. at 172 (concurring opinion).

See also Parker v. Municipal Judge of City of Las Vegas, Nev., 427 P.2d 642 (1967) (municipal ordinance making it a crime to be physically able to work and in a public place without visible means of support held unconstitutional).

**32.** The underlying principle is not new. The almost universal conception of a crime involves the presence of both *act* and *intent.* See note 29 *supra.*

tiffs are entitled to declaratory relief in accordance with the views and opinions expressed herein.[33]

Counsel for plaintiffs are directed to prepare an appropriate form of judgment.

"* * * Findings of fact shall not be set aside unless clearly erroneous and due regard shall be given to the opportunity of the municipal court to judge the credibility of the witnesses. * * *"

33. Zwickler v. Koota, 63 S.Ct. 877, 87 L. Ed. 1324, 389 U.S. 241, 88 S.Ct. 391 (1967); Douglas v. City of Jeannette, 319 U.S. 157 (1943). In *Douglas*, the Supreme Court denied the plaintiffs' request for an injunction, and in doing so it observed that

"an injunction looks to the future. Texas Co. v. Brown, 258 U.S. 466 [474, 42 S.Ct. 375, 377, 66 L.Ed. 721]; Standard Oil Co. v. United States, 283 U.S. 163 [182, 51 S.Ct. 421, 428, 75 L.

Ed. 926]. And in view of the decision rendered today in Murdock v. Pennsylvania [319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292], [Court held the ordinance in question unconstitutional] we find no ground for supposing that the intervention of a federal court, in order to secure petitioners' constitutional rights, will be either necessary or appropriate." 319 U.S. at 165, 63 S.Ct. at 882.