Mrs. Raymond M. WHEELER, Next Friend of: Harry Anthony Blackburn et al., Plaintiffs,

v.

J. C. GOODMAN, Jr., as Chief of Police of Charlotte, North Carolina; Robert M. Blackburn, as Clerk of Superior Court, Mecklenburg County, North Carolina; Captain William McCall; Sergeant L. L. McGraw; John Doe, et al.; Richard Roe, et al., and Attorney General of North Carolina, Robert Morgan, Defendants.

Civ. No. 2431.

United States District Court
W. D. North Carolina,
Charlotte Division.

Heard Aug. 18, 1969.

Decided Nov. 14, 1969.

George S. Daly, Jr., Casey & Daly, W. Thomas Ray, Adam Stein, Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., and Charles Lambeth, Thomasville, N. C., for plaintiffs.

Robert Morgan, Atty. Gen., of North Carolina, Ralph Moody, Deputy Atty. Gen., Andrew A. Vanore, Jr., Raleigh, N. C., Staff Atty., and W. A. Watts, Charlotte, N. C., for defendants.

Before CRAVEN, Circuit Judge, and JONES and McMILLAN, District Judges.

CRAVEN, Circuit Judge:

This is a suit under the Civil Rights Act, 42 U.S.C.A. § 1983 (1964), to obtain injunctive and other relief and to have the North Carolina vagrancy statute, N.C.Gen.Stat. § 14–336 (1953),[1] declared

1. The North Carolina statute was first enacted in 1905, but it has antecedents as early as the English statute of 1349. Today, the vagrancy statute reads, as follows:

§ 14–336. *Persons classed as vagrants.*—If any person shall come within any of the following classes, he shall be deemed a vagrant, and shall be fined not exceeding fifty dollars or imprisoned not exceeding thirty days: Provided, however, that this limitation of punishment shall not be binding except in cases of a first offense, and in all other cases such person may be fined or imprisoned, or both, in the discretion of the court:

1. Persons wandering or strolling about in idleness who are able to work and have no property to support them.

2. Persons leading an idle, immoral or profligate life, who have no property to support them and who are able to work and do not work.

3. All persons able to work having no property to support them and who have not some visible and known means of a fair, honest and reputable livelihood.

4. Persons having a fixed abode who have no visible property to support them and who live by stealing or by trading in, bartering for or buying stolen property.

5. Professional gamblers living in idleness.

6. All able-bodied men having no other visible means of support who shall live in idleness upon the wages or earnings of their mother, wife or minor children, except of male children over eighteen years old.

7. Keepers and inmates of bawdyhouses, assignation houses, lewd and disorderly houses, and other places where illegal sexual intercourse is habitually carried on: Provided, that nothing here is intended or shall be construed as abolishing the crime of keeping a bawdyhouse, or lessening the punishment by law for such crime.

unconstitutional. After a hearing before a single district judge, defendants, the Charlotte, North Carolina, police, were enjoined preliminarily from unconstitutional interrogations, searches, seizures, and arrests, as well as from interference with plaintiffs' freedoms of expression and association. Wheeler v. Goodman, 298 F.Supp. 935 (W.D.N.C.1969). Additionally, they were ordered to keep certain records of plaintiffs' arrest intact and under seal and were restrained from acting under color of the vagrancy statute against plaintiffs, or others. See generally Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), explained in Cameron v. Johnson, 390 U.S. 611, 619, 88 S.Ct. 1335, 20 L.Ed. 2d 182 (1968); 28 U.S.C.A. § 1343 (1962); 28 U.S.C.A. § 2283 (1965). A three-judge court has been convened to consider the constitutionality of the vagrancy statute. We hold N.C.Gen.Stat. § 14–336 unconstitutional because it is vague and overbroad; because it punishes mere status; and because it invidiously discriminates against those without property, all in violation of the Fourteenth Amendment.

## I.

The twelve plaintiffs are minors, represented here by next friend. They are commonly called "hippies," a term applied to certain persons, usually young, whose standards, attitudes, and dress differ in certain special ways from the norm. The Charlotte police, on their own initiative, decided that the plaintiffs were undesirable and harassed them systematically. The harassment was designed to discourage the plaintiffs' associations with one another and to dissuade them from visiting and occupying a certain residence leased by several of the plaintiffs for a home. The police action succeeded, and the house was abandoned by the plaintiffs for fear of further harassment.

The police misbehavior was described in almost incredible detail by the district judge. See Wheeler v. Goodman, 298 F. Supp. 935 (W.D.N.C.1967). We need not repeat that description, but we note that there were fifteen instances of police harassment between December 13, 1968, and January 18, 1969, inclusive. The harassment included unlawful threats, interrogations, searches, and seizures, as well as the service of two unlawful eviction notices. During one of these instances, on January 9, 1969, several officers entered the premises leased by plaintiffs and arrested eighteen persons inside the house for vagrancy. The police said they had gone to the residence on a "routine patrol," but the only reason offered for the entry and arrests was some "profane talk," which the police said they overheard while standing in the street outside the house. The police took plaintiffs to the station and thumbprinted them. Several of the plaintiffs were photographed. The cases were heard the next day and all the plaintiffs were released under a *"nolle prosequi* with leave," which means the prosecution is "suspended," but can be reopened at the state's whim.[2]

During the period of harassment the police discovered no evidence of illegality. Seemingly, the plaintiffs never committed any crime; nor was there probable cause to suppose that they did.

## II.

The constitutionality of the North Carolina vagrancy statute is squarely presented here. Furthermore, the posture of this case does not permit us to stop short of a declaration of constitutional invalidity. Compare Rescue Army v. Municipal Court, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis dissenting). Had the plaintiffs been convicted, relief might well have been afforded them in habeas corpus, or on appeal within the state system, by the application of exclusionary

2. *But see* Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), which imposed limits on the *nolle prosequi* with leave.

rules developed to discourage oppressive police action by the exclusion of evidence improperly obtained. Often in such situations it is unnecessary to reach the validity of the underlying criminal statute upon which prosecution was based.

■ Here, however, there are no convictions and no one is in custody. The plaintiffs were damaged in that they were literally driven from their home. Their injury, is a continuing one: the constant fear of unlawful harassment and arrest without probable cause. It is in this context that we must decide the constitutional validity of the North Carolina vagrancy statute.

■ We first hold the North Carolina statute void for vagueness and overbreadth. The statute's terms do not give fair notice of what acts are criminally prohibited and are so broad as to embrace, on its face, obviously innocent activities. See Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966); Wright v. Georgia, 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963). A recent three-judge court case from Kentucky reinforces our holding here. In Baker v. Bindner, 274 F.Supp. 658 (W.D. Ky.1967), the court held Kentucky's vagrancy statute unconstitutional for vagueness and overbreadth. Like the North Carolina statute, the Kentucky statute was framed in terms such as "able-bodied," "honest livelihood," "honest labor," "idle," "dissolute," and "visible means of support." The court, in describing that statute, made a statement we consider apposite here:

> This statute is a "catch all" not specific in expression as to what it really seeks to prohibit nor what type of conduct is violative of the prohibition. Perhaps such was its aim and intent; that it snare those felt to be vaguely undesirable. 274 F.Supp. at 662.

Words and phrases such as "able-bodied," "idleness," "honest and reputable livelihood," "immoral and profligate," "visible means of support," "lewd and disorderly," "assignation houses," and like terms provide no ascertainable standard to which men of common intelligence can adhere in order to avoid the statute's proscriptions. Such terms create a statute of such breadth that it infringes on constitutionally protected rights under the First, Fourth, Fifth and Fourteenth Amendments. Plaintiffs, as everyone else, are entitled to be free from unconstitutional searches, seizures, and arrests, as well as from inhibitions upon their freedoms of expression and association imposed by the police through use of the vagrancy statute. No North Carolina decision has construed away these constitutional defects, which are apparent on the face of the statute.[3]

In many ways the case before us is similar to Wright v. Georgia, 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963). In *Wright*, six Negro youths were arrested for playing basketball in a "white" park. They were convicted of "breach of the peace" on the testimony by the

---

3. The Attorney General of North Carolina, who was allowed to intervene, cites us to an authority holding that the averments in the complaint must bring defendant within one of the seven classes of persons described in the statute. State v. Harris, 229 N.C. 413, 50 S.E.2d 1 (1948). Another case holds all the elements of a vagrant, as prescribed by one of the classifications of the statute, must be present in order to convict of vagrancy. State v. Millner, 240 N.C. 602, 83 S.E.2d 546 (1954). Neither holding is sufficient to cure the unconstitutional vagueness and overbreath of the statute, since neither narrows the meaning of the terms in the statute. Other equally vague statutes have been saved by the judicial interpretation of the state's highest court, so that what was too broad in the statute is made precise by construction. In these situations, federal courts defer to the authority of state courts to speak wih finality on state law. *See, e. g.*, Perkins v. North Carolina, 234 F.Supp. 333, 336 (W.D. N.C.1964). Unfortunately, no other cases that narrow the statute's terms enough to save it have been called to our attention, and we have found none.

police that proved the boys had been arrested only because they were black. The United States Supreme Court declared the Georgia breach of the peace statute [4] unconstitutional for vagueness as applied to those facts [5]

Here plaintiffs' real offense (to the police) consisted of their being hippies. They were at home—not wandering about idly or otherwise. It was enough to initiate oppressive police action that plaintiffs seemed "vaguely undesirable," just as the Negroes in *Wright* seemed undesirable in a "white" park.

■ Freedom to conform to community behavior patterns is not liberty, but state regimentation. There can never be total freedom of action for the individual, since behavior that is harmful to others cannot be permitted. But toleration of nonconformity is the test of a mature, established government. In the United States belief and noninjurious behavior are not punishable. A man is free to be a hippie, a Methodist, a Jew, a Black Panther, a Kiwanian, or even a Communist, so long as his conduct does not imperil others, or infringe upon their rights. In short, it is no crime to be a hippie. Hughes v. Rizzo, 282 F.Supp. 881, 884 (E.D.Penn.1968).

■ The equal protection clause of the Fourteenth Amendment requires that a statutory classification be reasonable, as well as necessary to accomplish a permissible state policy. McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L. Ed.2d 222 (1964). Sections 1 through 4 and 6 of the vagrancy statute are written in terms of "classes." Those with property are exempt and may live idly, blessed by the criminal law. Those without property must be gainfully employed, and it is no excuse that there may be no jobs available. If Washington decides to cool the economy by permitting unemployment to rise from three to five percent, the number of vagrants will increase considerably, for criminal intent is not an element of the offense. Under Section 3 of the statute, for example, it is enough for guilt that a man (1) be able to work, (2) lack property, and (3) have no fair, honest job. To make poverty and misfortune criminal is contrary to our fundamental beliefs, and to arrest and prosecute a person under this statute violates the Fourteenth Amendment. The equal protection clause of that Amendment does not permit the unreasonable classifications made by this statute: idleness and poverty, without fault, cannot be made the elements of a crime, and one cannot be punished as a vagrant on the premise that he may commit a crime in the future because he is presently poor and unemployed.

The due process clause of the Fourteenth Amendment prohibits as cruel and unusual the punishment of status. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Sections 1 through 4 and 6 of the statute attempt to punish economic status without mens rea. No overt act is required to convict for vagrancy—only indigency and idleness, coupled with the ability to work. The Supreme Judicial Court of Massachusetts recently characterized a similar statute in terms that are appropriate here. In Alegata v. Commonwealth, 353 Mass. 287, 231 N.E.2d 201 (1967), that court wrote, as follows:

What the statute attempts to proscribe is not the commission of some act or acts, as is usually the case in most crimes. Rather it seeks to punish a person because of his status. The offense consists of being a certain kind of person, that is, an idle person,

---

4. Ga.Code Anno. § 26–5301 (1953).

5. The Court's holding is not clear. After reading the opinion closely, we are uncertain whether the Court flatly held the statute unconstitutional because of vagueness or merely unconstitutional for vagueness as applied to the facts of the case.

The more reasonable interpretation of the opinion, however, is that it is limited to the facts before the Court and that the statute is otherwise valid. The opinion does not disclose whether the Georgia courts have construed the statute more precisely as to other facts, *e. g.*, street fighting or boisterous behavior.

who, not having visible means of support, lives without lawful employment. See *Lacey,* op. cit. *supra* at 1203; Commonwealth v. O'Brien, 179 Mass. 533, 534, 61 N.E. 213.

The vagrancy laws are of ancient origin. They stem from the Statutes of Labourers (23 Edw. 3, 25 Edw. 3, Stat. 1) the first of which was enacted in 1349. The reasons leading to the enactment of these and subsequent statutes in England are set forth in the following references: Dublin and Robinson, The Vagrancy Concept Reconsidered, 37 N.Y.U.L.Rev. 102; Lacey, Vagrancy and Other Crimes of Personal Condition, 66 Harv.L.Rev. 1203; Douglas, Vagrancy and Arrest on Suspicion, 70 Yale L.J. 1; Opinion of Scott, L.J., in Ledwith v. Roberts, [1937] 1 K.B. 232, 271, et seq. These statutes originated in the breakup of the feudal system and were aimed at runaway serfs. Subsequent enactments were designed to supplement the Poor Laws, and to prevent crime. Today the sole justification of the vagrancy laws (which appears to be a crime in most, if not all, American jurisdictions) is the prevention of crime. The philosophy underlying modern vagrancy statutes was stated in *District of Columbia v. Hunt,* as follows: "A vagrant is a probable criminal; and the purpose of the [vagrancy] statute is to prevent crimes which may likely flow from his mode of life." 82 U.S.App.D.C. 159, 163 F.2d 833, 835. See Fenster v. Leary, 20 N.Y.2d 309, 282 N.Y.S.2d 739, 229 N.E.2d 426.

Although vagrancy statutes have been on the statute books of virtually every State for a long time they have only recently come under judicial scrutiny on constitutional grounds. Cases where vagrancy statutes have been upheld are: State v. Grenz, 26 Wash.2d 764, 175 P.2d 633 (5 to 4 decision); Hicks v. District of Columbia, 197 A.2d 154 (D.C.Ct.App.), cert. dism. as "improvidently granted," 383 U.S. 252, 86 S.Ct. 798, 15 L.Ed.2d 744; Dominguez v. City and County of Denver, 147 Colo. 233, 363 P.2d 661. But vagrancy laws have not gone unchallenged, as the observation of Frankfurter, J., in his dissenting opinion in Winters v. People of State of New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840, reveals. Speaking of vagrancy and similar statutes he said at page 540, 68 S.Ct. at page 682, "These statutes are in a class by themselves, in view of the familiar abuses to which they are put. * * * Definiteness is designedly avoided so as to allow the net to be cast at large, to enable men to be caught who are vaguely undesirable in the eyes of police and prosecution, although not chargeable with any particular offense. In short, these 'vagrancy statutes,' and laws against gangs are not fenced in by the text of the statute or by the subject matter so as to give notice of conduct to be avoided." And two courts very recently have invalidated vagrancy statutes quite similar to ours. Fenster v. Leary, 20 N.Y.2d 309, 282 N.Y.S.2d 739, 229 N.E.2d 426. Baker v. Bindner, 274 F.Supp. 658 (W.D.Ky., a decision by a three-judge court). As the New York Court of Appeals pointed out in the *Fenster* case, vagrancy statutes today are used only against "alcoholic derelicts and other unfortunates, whose only crime, if any, is against themselves, and whose main offense usually consists in their leaving the environs of skid row and disturbing *by their presence* the sensibilities of residents of nicer parts of the community, or suspected criminals, with respect to whom the authorities do not have enough evidence to make a proper arrest or secure a conviction on the crime suspected." Persons of the former group should not be classed as criminals. Idleness and poverty should not be treated as a criminal offense. See Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758. As to persons of the latter group (those vaguely suspected of criminal conduct) the statute may not

be used as a short cut to avoid due process requirements.

We hold that the challenged portions of § 66 are void on their face as repugnant to the due process clause of the Fourteenth Amendment and to art. 12 of our Declaration of Rights in that they seek to make criminal conduct which cannot fairly be classed as such and are an invalid exercise of the police power. We also hold that the provisions under consideration are void for vagueness. Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888. Commonwealth v. Carpenter, 325 Mass. 519, 521, 91 N.E.2d 666.

Sections 5 and 7 require separate analysis. These sections depart completely from the traditional and historical meaning of vagrancy.[6] In these sections the North Carolina General Assembly attributes the status of vagrant to gamblers, madams, and prostitutes.[7] Professional gamblers and keepers and inmates of bawdy houses may well be evil persons who ought to be controlled by the sanctions of the criminal law.[8] But to suppose, indeed, conclusively presume, that they are vagrants is irrational nonsense. One might as sensibly deem them to be Franciscan monks or murderers. One need only watch television or visit Las Vegas to observe that not all professional gamblers lack property and that many are not idle. As for inmates of bawdy houses, the legislative premise that they are visited only by the poor is manifestly absurd. Libido afflicts both the rich and poor with fine impartiality.

Where there is no rational connection between premise and conclusion, even legislative presumptions must fail. See Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); United States v. Romano, 382 U.S. 136, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965).

■ Nor can Sections 5 and 7 be saved on the theory that the legislature used "vagrant" in a special sense, as a coined word without reference to its meaning at common law. Such a purpose appears very unlikely in the context of a statute using "vagrant" in its traditional sense in five other sections. But the result would be, nevertheless, unconstitutional. Status—even that of a gambler or prostitute—may not be made criminal. Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968); Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The *acts* of gambling, prostitution, and operating bawdy houses are criminally punishable, of course, but the state cannot create the special status of vagrant for persons who commit those illegal acts and then punish the status instead of the act. The due process clause of the Fourteenth Amendment is violated by the statute's attempt to do so.

The conclusions expressed thus far are bolstered by numerous holdings in 1969 alone that condemn vagrancy as unconstitutional. See Lazarus v. Faircloth, 301 F.Supp. 266, (June 9, 1969); Kirkwood v. Ellington, 298 F.Supp. 461 (W.D. Tenn. 1969); Broughton v. Brewer, 298 F.Supp. 260 (N.D., S.D.Ala.1969) (consolidated cases); Goldman v. Knecht, 295 F.Supp. 897 (D.Colo.1969). All but one of the holdings were based on vagueness and overbreadth, but *Goldman* held the Colorado vagrancy statute unconstitutional for violating the equal protection and due process clauses of the Fourteenth Amendment as well. These cases support the proposition that the courts will no longer tolerate the abuse of constitutional freedoms under the guise of

---

6. For an excellent short discussion of "traditional" vagrancy concepts see Goldman v. Knecht, 295 F.Supp. 897 at 902, 903 & nn. 9–17 (D.Colo.1969).

7. Section 5 makes "professional gamblers living in idleness" vagrants, while Section 7 brands as vagrants "[k]eepers and inmates of bawdy houses, assignation hous-es, lewd and disorderly houses, and other places where illegal sexual intercourse is carried on: * * *."

8. Indeed, they are. *See* N.C.Gen.Stat. §§ 19–1, 72–36 to 72–39, 14–185, 14–187, 14–188, 14–198, 14–203 to 14–208, 14–337, 134–27, 134–34, 134–43.

crime prevention—a view with which we are in complete accord.

Although we must invalidate the vagrancy statute, we are not indifferent to the problems of the police. A statute that will allow the police to stop crime before it starts is both necessary and desirable. The extent to which idleness breeds crime is not established on this record, or otherwise, as far as we know. Assuming the relationship, however, the North Carolina statute goes too far. Crime prevention is not an absolute value. Methods of prevention are constantly weighed against the personal liberties enshrined in the Constitution. Here the outrageous police action under color of the vagrancy statute is far too high a price to pay for crime prevention. This conclusion is especially valid where, as here, crime prevention can be accomplished by legitimate means.[9] We reiterate, however, that the record does not suggest that the plaintiffs ever contemplated any criminal activity.

### III.

■ As part of the relief requested, the plaintiffs ask that we cause the expunction of their arrest records. This is a request for equitable relief under the Civil Rights Act, 42 U.S.C.A. § 1983 (1964). It is urged that employers commonly inquire whether an applicant for employment has ever been arrested and that, where an arrest is unlawful, the victim should be entitled equitably to deny that it ever occurred.[10] The general rule is that an equity court should not order expunction unless extreme circumstances exist—for example, where the records do not serve to protect society, or their future misuse is likely. See United States v. McLeod, 385 F.2d 734 (5th Cir. 1967); cf. United States v. Kalish, 271 F.Supp. 968 (D.Puerto Rico 1967).

Arrest records exist to facilitate criminal investigation, but the plaintiffs' records here perform no such function. Plaintiffs have committed no crimes, and retention of their arrest records cannot be justified as "criminal identification." In fact, N.C.Gen.Stat. § 114–19 (1966) provides specifically that photographs are not to be taken of one arrested for a misdemeanor unless certain specified conditions exist—conditions that show the arrestee is more notorious than a misdemeanant and, therefore, a proper subject for criminal identification.[11]

9. Despite innovative court decisions of the last decade that have made law enforcement more difficult, the police are not yet, and we hope will never be, helpless to prevent crime. Arrests may still be made upon probable cause to believe a crime has been committed, Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), search warrants may yet be procured, Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 114 n. 4, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Jones v. United States, 362 U.S. 257, 268, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), and "stop and frisk" laws, properly drawn, enable investigation of suspicious conduct, as well as interrogations of those suspected of criminal intent, Peters v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Moreover, legislation has been proposed that would give the police extensive power to stop and interrogate persons for investigative purposes. Model Code of Prearraignment Procedure, Art. 2 (1969) (Tent.Draft No. 2).

10. Whether an unlawful arrest "occurred" is a question of semantics. One possible viewpoint is that there was never any "arrest" at all, but that the victim, in reality, was "falsely imprisoned."

11. In pertinent part N.C.Gen.Stat. § 114–19 provides:
No officer shall take the photograph of a person arrested and charged with a misdemeanor, unless such person is a fugitive from justice or unless such person shall, at the time of arrest, have in his possession property or goods reasonably believed by such officer to have been stolen, or unless the officer has reasonable grounds to believe that such person is wanted by the Federal Bureau of Investigation, the State Bureau of Investigation or some other law enforcement officer or agent.

The existence of the records could harm plaintiffs unfairly, and this possibility suggests expunction where criminal investigation is not subserved in the least by retention of the files. We do not hold that expunction is appropriate every time a defendant is acquitted or released without prosecution, but on the facts of this case, including the youth of the plaintiffs, their innocence of any crime, the extreme misbehavior of the police in making arrests without probable cause, and the absence of any benefit to society in the maintenance of the arrest records, we think expunction should be allowed. See Hughes v. Rizzo, 282 F.Supp. 881, 885 (E.D.Penn.1968).

N.C.Gen.Stat. § 14–336 is declared unconstitutional and its enforcement against plaintiffs and all others will be permanently enjoined.

Expunction of plaintiffs' arrest records will be ordered.

Plaintiffs will be allowed to recover their costs.