Lawrence R. BILICK et al., Plaintiffs,

v.

Hon. Edward R. DUDLEY, Administrative Judge of the Criminal Court of the City of New York, et al., Defendants.

No. 67 Civ. 3317.

United States District Court,
S. D. New York.

March 30, 1973.

William M. Kunstler, c/o Center for Constitutional Rights, New York City, Moe Tandler, St. Albans, N. Y., Margaret L. Ratner, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. N.Y., New York City, William J. Ryan, Asst. Atty. Gen., for defendants.

## OPINION

GRIESA, District Judge.

This is an action on behalf of 86 young men and women arrested on November 5, 1966 by a group of New York City policemen at a social and political gathering sponsored by the City College of New York chapter of the W. E. B. DuBois Club. This organization was active in opposing the American involvement in the Vietnam War, and urging the abolition of the draft. At the time of the incident in question the DuBois Club was campaigning in New York City in support of the Civilian Complaint Review Board for the Police Department. The question of whether to retain or abolish this board was to be voted on in a city referendum November 8, 1966.

Plaintiffs claim that they were arrested without any legitimate cause; and that the purpose of the arrests was to disrupt DuBois Club political activities—particularly those in support of the Civilian Review Board. Plaintiffs urge that the arrests violated their constitutional rights under the First, Fourth and Fourteenth Amendments. Suit is brought under the Constitution and various federal statutes, particularly Section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983,[1] against the four policemen who carried out the arrest, the police Captain of the precinct where plaintiffs' arrests were processed, the Police Commissioner of the City of New York, the District Attorney of New York County, the Administrative Judge of the Criminal Court of New York City, and the Chief Clerk of that court.

Plaintiffs seek a declaration that their arrests were without probable cause in violation of plaintiffs' constitutional rights. Plaintiffs also seek an injunction directing defendants to expunge all records of the arrests and prohibiting defendants from providing information regarding the arrests to law enforcement agencies, prospective employers, and others.

The case was tried before the Court without a jury. This decision constitutes the Court's findings of fact and conclusions of law.

### Facts

*The DuBois Club Party*

The gathering at which the arrests were made took place at an apartment on West 92nd Street, New York City. A party sponsored by the DuBois Club was being held there on the evening of November 5, 1966, which had both a social and a political purpose. A small admission fee (99¢) was charged. There were refreshments consisting of soft drinks and light snacks. There was guitar playing, singing, and some dancing to a record player. It was intended, had not the arrests intervened, to have speeches and a discussion of intensive campaigning in favor of the Civilian Review Board in the remaining few days before the referendum.

The persons at the party were in the range of 16–25 years of age. The ma-

---

1. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

jority were high school and college students.

There is no evidence that liquor or beer was used at the party. The only evidence that anyone at the party was using narcotics related to *possible* use by one teen-age girl who was in a room with one or two other girls separated from the main group.

The arrests which gave rise to the present lawsuit occurred around midnight. The evidence of plaintiffs and defendants is in conflict in some respects regarding the events leading to the arrests.

*Plaintiffs' Testimony Regarding Arrests*

Six of the plaintiffs testified in some degree of detail about these events. According to this testimony, about 11:30 P.M. three men came to the door of the apartment and made their way into the apartment. They were markedly older and different in appearance than those attending the party. They refused to pay the 99¢ admission charge. A number of the people at the party crowded around them and asked who they were and what they were doing.

Five of the six plaintiffs who testified on the subject stated categorically that the three men refused to identify themselves in any way. The sixth of these plaintiffs testified that he recalls that the men said they were police officers, but refused to show any badges, or warrants, or other police identification. These six plaintiffs were unanimous in testifying that the three men gave no explanation of their purpose in entering the apartment.

The plaintiffs' evidence is that the DuBois Club members who were in charge of the party feared that the presence of the three men might cause trouble. They wanted to get the men out of the apartment. The three men were told to get out. In addition, a group of about ten of the young men at the party pushed the strangers out the apartment door. At this point one or more of the three men called out that the people at the party were under arrest.

About one half hour later a group of uniformed New York City police arrived. All 87 persons at the party were arrested and taken to the 24th Precinct station on West 100th Street. They were kept at that station until about 3:00 A.M., November 6th, when they were taken to cells in the Criminal Court building at 100 Centre Street.

Eighty-six of the arrested persons were charged with congregating for the purpose of using narcotics, in violation of Section 1533 of the New York Penal Law, which makes such an offense a misdemeanor.[2] They were also charged with disorderly conduct in violation of Section 722(5) of the Penal Law. Disorderly conduct is an "offense" although it is not a "crime" since it is neither a misdemeanor nor a felony.[3]

One of the girls at the party was arraigned in Children's Court on a charge of possession of narcotics. The charge was dismissed and the record sealed. No claim is now being made in this action with respect to her.

2. Section 1533, as it existed in 1965 (prior to a revision effective September 1, 1967) provided in pertinent part: "A person who . . . . (2) Opens or maintains a place where any narcotic drug is unlawfully used; or . . . . (4) Visits or resorts to any such place for the purpose of unlawfully using any narcotic drug . . . . [i]s guilty of a misdemeanor." 39 McKinney's Consol. Laws, c. 40, § 1533 (1944; 1966 Supp.).

3. Section 722 of the Penal Law, as it existed in 1965 (prior to a revision effective September 1, 1967) provided in pertinent part: "Any person who with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned, commits any of the following acts shall be deemed to have committed the offense of disorderly conduct: . . . . (5) Shouts or makes a noise either outside or inside a building during the night time to the annoyance or disturbance of any considerable number of persons." 39 McKinney § 722 (1944).

At about 3:00 P.M., November 6th, the 86 were taken before Justice Joseph A. Martinis of the Criminal Court of the City of New York. The Assistant District Attorney in charge of the matter immediately moved to dismiss the charges against all 86 on the ground of lack of evidence to prove any offenses. The motion was granted.

### Police Testimony Regarding Arrests

Two of the police officers—Detectives Daniel Keogh and John T. Farrell—testified. According to their testimony, on the evening of November 5th, they were working with two other officers—Detectives Stines and Moynihan—on a liquor investigation. They were approached by a Dr. Ackerman, who said that his son and the son's girlfriend had been missing for about 24 hours. This man directed the four policemen to the apartment on West 92nd Street, which was the scene of the party described above.

According to the police testimony, the four policemen (all in plain clothes) and Dr. Ackerman arrived at the party, where one or more of the policemen identified themselves and showed police badges. They introduced Dr. Ackerman and said that he was looking for his son. Detectives Farrell and Keogh walked around the apartment with Dr. Ackerman, and Detectives Stines and Moynihan remained in the foyer by the apartment door. Dr. Ackerman did not find his son or the son's girlfriend, both of whom had been at the apartment earlier, but had left by the time of the search.

At some point there was a commotion at the door. Detective Farrell has testified that some of the young men at the party were hitting Detective Moynihan.

The police evidence is in agreement with the testimony presented by plaintiffs that the policemen were pushed out of the apartment by about ten of the men at the party, and that as the policemen were being forced out one of them called out that the people at the party were under arrest. Dr. Ackerman apparently exited on his own.

According to the police, some neighbors were outside the apartment and were complaining about the noise of the party. Detective Moynihan was dispatched to an apartment upstairs to call the uniformed police. Detective Moynihan was told by the occupants of the upstairs apartment that they had observed a young girl in the apartment where the party was being given throw an envelope out the window. Detective Moynihan went to a landing of the apartment building and retrieved the envelope, which he believed to contain a small quantity of marijuana.

The description of the girl who threw the envelope, and the clothing worn by that girl, coincided with the appearance and dress of the 15-year old girl whom Detectives Keogh and Farrell had seen in the bedroom.

As already noted, the 15-year old girl was arrested and charged with possession of narcotics. The 86 other young men and women at the party were arrested and charged with disorderly conduct and congregating for the purpose of using narcotics.

The police witnesses have admitted that the sole basis for arresting the 86 on a narcotics charge was the fact that they had been told about the white envelope containing marijuana being thrown out the window by the 15-year old girl. They observed no evidence of marijuana use on the part of the 86 others.

The basis for the charge of disorderly conduct was the complaint by the upstairs neighbors—a Mr. and Mrs. Barrett.[4] These are the persons who re-

---

4. According to the police testimony, the first announcement that the people at the party were under arrest came as the policemen were being pushed out of the apartment. However, the police do not claim that the pushing incident was a grounds for the arrest. In any event, the police testimony is that a maximum of 15 persons was involved in this incident. Detective Farrell admitted the obvious fact that he saw the faces of the pushers at close range. However, the police did nothing either at the apartment or later at the station house to limit the arrests to those involved in the pushing incident.

ported seeing the young girl throw the envelope out of the window. The minutes of the Criminal Court hearing of November 6th indicate that Mr. Barrett signed a complaint charging violation of Section 722(5) of the Penal Law.

The trouble is that the complaint of Mr. Barrett has not been produced, and apparently it cannot be located in the Criminal Court file. Neither Mr. Barrett nor Mrs. Barrett testified at the trial of this case. Detective Keogh has testified that the Barretts complained about the party that night and about occasionally noisy parties in the same apartment but we have no information about whether the Barretts described, either to the police or in Mr. Barrett's complaining affidavit, any specific facts about the type, degree and duration of the noise or disturbance.

The only direct evidence in this case is that the party was a relatively quiet one with most of the young men and women talking or listening to the music of two guitars. Neither of the police witnesses indicated anything to the contrary. There was no evidence to indicate anything approaching the kind of disturbance which could be labeled disorderly conduct in violation of Section 722(5) of the Penal Law.

Also of significance is the fact that the police witnesses admitted that there was no attempt to single out any persons who were making, or who were responsible for any alleged excessive noise. There was simply a dragnet arrest of the entire group of 86 young men and women.

*Question of Political Motive in Arrests*

Plaintiffs' contention in this case is that the police came to the party in order to disrupt the activity of a radical group, which was at that time supporting a cause—the Civilian Review Board —which was strongly opposed by the city police.

I cannot find from the evidence that the police initially came to the party for the purpose of disrupting it. The police testimony about accompanying Dr. Ackerman on the search for his son and his son's girlfriend has not been successfully challenged.

The question still remains as to whether, once the police had arrived at the party, they saw indications of the political activities, and were motivated in their arrests by an intent to disrupt these activities. Signs in the apartment building lobby and at the entrance of the apartment itself clearly identified this as a DuBois Club function. There was a small table at the entrance to the apartment containing literature specifically on the subject of the Civilian Review Board. Most of the persons at the party were wearing DuBois Club buttons with slogans such as "Peace, Jobs and Freedom" and "Youth Unite, Resist the Draft."

In my view, plaintiffs have proved that before these arrests were made the police knew that this party had in part a political purpose, and that this purpose related to support of the Civilian Review Board. The police must have known of these circumstances from the literature, signs and buttons which they saw. The conclusion is that when the police made the arrests of the 86 young men and women they knew that they were breaking up a political activity.

*Voluntary Expungement of Records by Police Department*

Following the bringing of this action, the Police Commissioner of the City of New York, without conceding that plaintiffs state a claim upon which relief can be granted and without admitting any improper conduct in connection with the arrests, consented to expunge all of the records of the arrests of the 86 young men and women in the custody or control of the Police Department. The Corporation Counsel, who had originally represented the "City defendants"—i. e., the Police Commissioner, the 24th Precinct Captain and the individual police officers—did not appear at the trial.

The question at the trial basically related to whether plaintiffs are entitled to relief against the State court officials, who have refused to seal or expunge the court records.

### State Court Records

The Assistant Attorney General produced at the trial the records which had been delivered to him by the Criminal Court in response to his request for all remaining records pertaining to this matter. The records produced are obviously incomplete. It is not clear whether the explanation is a temporary mis-filing, or a permanent loss of certain of the records.

Only two documents were produced in Court. One is a complaint signed by Detective Daniel M. Keogh dated November 6, 1966, charging 45 of the plaintiffs herein with congregating for the purpose of using narcotics, in violation of Section 1533 of the Penal Law. The complaint is endorsed with a notation that the proceeding was dismissed on motion of the Assistant District Attorney on November 6, 1966.

The other record produced is the minutes of the arraignment hearing before Justice Martinis on November 6, 1966. Oddly enough, these minutes pertain to 41 persons *other than* the ones named in the complaint. In other words, there is a complaint, and no minutes, as to 45 of the plaintiffs; and there are minutes, but no complaint, as to 41. The minutes show that the 41 persons referred to therein were charged with violations of Sections 722(5) and 1533 of the Penal Law. The minutes conclude as follows:

"MR. MAC LACHLAN: Your Honor, the people have an application.

THE COURT: I'll hear you.

MR. MAC LACHLAN: Your Honor, I went over the facts in the affidavit. I discussed the facts with each of the arresting officers and the civilian complainant. I come to the conclusion, the people will not be able to prove the case, as to each charge and each defendant, beyond a reason-able doubt, and therefor, I move to dismiss each charge against each defendant.

THE COURT: So ordered."

### Conclusions of Law

■ At the conclusion of the trial, the Assistant Attorney General conceded that the "mass arrests" (to use his term) of the 86 young men and women were without probable cause. Even without such a concession, I would hold without hesitation, on the basis of the facts described above, that the arrests were lacking in any valid cause and were clear violations of plaintiffs' rights, under the Fourth Amendment to the Constitution, to be "secure . . . against unreasonable searches and seizures." Since I have found that the police knew, or must have known, that the gathering was at least in part for a political purpose, I also hold that the arrests were violations of plaintiffs' First Amendment rights of freedom of assembly and speech.

As already described, the Police Department has voluntarily expunged all its records relative to these arrests. The Criminal Court has declined to do likewise, and maintains records which show the arrests of the 86 persons and the narcotics and disorderly conduct charges against them. The records also show the dismissal of these charges.

I have no doubt as to the substantial detriment caused to these 86 persons, arising from the arrests and from the continued maintenance of records thereof in the Criminal Court of the City of New York. This detriment exists despite the fact that the records show the dismissal of the charges.

The problem which can arise with respect to a person with an arrest record seeking employment is well known.

"The problem posed by the existence of an arrest record is altogether too clear in the area of employment. Many, if not most, employers and employment agencies inquire whether an applicant has been arrested regardless

of whether a conviction resulted. An affirmative answer to the question is often sufficient to deny the applicant further consideration. Where there are two or more applicants for the same job, those with previous arrest records certainly stand in a less favorable position vis-a-vis the other applicants. A recent survey of employment agencies in the New York City area indicated that approximately seventy-five percent of the sampled agencies do not refer any applicant with a record of arrest, whether or not followed by discharge, acquittal, or conviction." Note, Discrimination on the Basis of Arrest Records, 56 Cornell L.Rev. 470–471 (1971).

The survey of New York City area employment agencies, referred to above, is discussed in the President's Commission on Law Enforcement and Administration of Justice, Report: The Challenge of Crime in a Free Society 75 (1967).

One of the plaintiffs at the trial testified in detail as to obstacles and substantial delays experienced by him in obtaining social service employment with the City of New York, because of his arrest record. Other plaintiffs testified about difficulties they had had, or could reasonably anticipate in the future, arising from the fact that they had been subjected to these arrests.

In apparent recognition of certain elements of unfairness resulting from dredging up facts about former arrests, there is some trend *away* from compelling disclosure of such arrests in employment applications, etc. In January 1973 The New York City Commission on Human Rights announced that The Commission would consider it to be an unlawful discriminatory practice for employers or employment agencies to ask applicants any question relating to arrest records, or to solicit such information from credit companies or other similar sources, or to utilize arrest record information as a selection criterion.

Apparently the United States Civil Service Commission has ceased to inquire as to prior arrests on its application forms. 56 Cornell L.Rev. 480, n. 42.

At the trial of this action, plaintiffs introduced various applications for employment and for professional licensing. In each case such applications asked whether the applicant had been arrested or charged with a crime, and asked for an explanation of the circumstances. According to an inquiry by my office, certain of these applications have been changed to omit questions about arrests.[5] However, an applicant for admission to the bar in the State of New York (at least in the First and Second Judicial Departments) and an applicant for a teacher's license in New York City must answer questions about all arrests to which they have been subjected.

All in all, it seems that the climate of opinion is changing and that employers, licensing boards, law enforcement agencies, and the courts, may come to attach less significance to an arrest record than has been done in the past. However, the situation is not such as to permit plaintiffs' claims of damage in the present case to be brushed aside. It is, of course, possible for any young man or woman to recover from the effects of prior arrests—and prior convictions, for that matter. But there is hardly anyone who would deny that an arrest record— particularly involving a narcotics charge —is a substantial blight in one's background. The Supreme Court, through Justice Jackson, stated in Michelson v. United States, 335 U.S. 469, 482, 69 S. Ct. 213, 222, 93 L.Ed. 168 (1948):

> "Arrest without more may nevertheless impair or cloud one's reputation. False arrest may do that. Even to be acquitted may damage one's good name if the community receives the verdict with a wink and chooses to remember defendant as one who ought to have been convicted."

---

5. Application for registration with the National Association of Securities Dealers, and application for medical license in the State of New York.

What relief is proper? The Assistant Attorney General, at the conclusion of the trial, stated that the State would have no objection to a declaration that the arrests were invalid and to a sealing of the remaining records. Plaintiffs insist that the records have no possible utility and should be expunged.

There is no statutory authority in this State for the expungement of court records. There are certain provisions limiting the availability for inspection of Family Court records involving juveniles. 29A McKinney §§ 712, 713 and 784. In certain instances the Family Court has ordered the complete sealing of records of juveniles. Henry v. Looney, 65 Misc.2d 759, 317 N.Y.S.2d 848 (Sup.Ct.1971); In Re Smith, 63 Misc.2d 198, 310 N.Y.S.2d 617 (N.Y.C.Fam.Ct. 1970).

The New York Criminal Procedure Law, which became effective September 1, 1971, has a provision which involves the sealing of court and police records under certain circumstances where there has been a charge of loitering for the purpose of unlawfully using or possessing marijuana. This loitering statute was formerly Section 1533 of the Penal Law (involved in this case) and is now Section 240.36 of the Penal Law. Section 1533 referred to "any narcotic drug" and Section 240.36 refers to "a dangerous drug." Where the charge involves marijuana only, Section 170.56 of the Criminal Procedure Law provides that, in the case of first offenders, the court may adjourn the action for a period of time "in contemplation of dismissal" and may dismiss the action if, during the adjournment, the defendant has complied with the conditions set by the court. This section further provides that upon dismissal of the charges under this procedure, the court shall order that all official records and papers relating to the defendant's arrest and prosecution—both court and police records—are to be sealed.

Although this section of the Criminal Procedure Law indicates a policy of the State to give certain protection to certain classes of onetime marijuana offenders, it does not of course solve the issues in the present action. It does not apply to the arrests involved in this case, which occurred several years before this statute became effective. Moreover, it does not deal with the problem of arrests which are totally invalid.

■ In my view, the proper remedy is to expunge the remaining records of the arrests in this case. This is the remedy which will, to the maximum extent possible, eliminate the effects of the illegal arrests. See Carter v. Jury Commission, 396 U.S. 320, 340, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970).

United States v. McLeod, 385 F.2d 734 (5th Cir. 1967), involved illegal arrests and convictions in Dallas County, Alabama, designed to prevent certain citizens from voting. The action was brought under 42 U.S.C. § 1971(b), specifically dealing with voting rights. The Court held that appropriate relief should include expungement of all the records relating to the arrests and convictions. Judge Wisdom stated (pp. 749–50):

"In order to grant full relief in this case, we must see that as far as possible the persons who were arrested and prosecuted in violation of section 1971(b) are placed in the position in which they would have stood had the county not acted unlawfully. . . . Of course no court order can completely eradicate the effect of the county's actions. . . . The Court can and must, however, do all within its power to eradicate the effect of the unlawful prosecutions in this case. We therefore hold that the district court should enter an order requiring the appropriate officials of Dallas County to return all fines, and to expunge from the record all arrests and convictions resulting from the prosecutions which form the basis for these suits."

Hughes v. Rizzo, 282 F.Supp. 881 (E.D. Pa.1968), was an action under 42 U.S.C. § 1983 to obtain relief against police

harassment of hippies in Rittenhouse Square in Philadelphia. The incidents complained about involved two occasions when between 20 and 30 young persons were arrested by the Philadelphia police, were questioned and detained at a police station, and then were released without prosecution. Judge Fullam ordered that all records of these arrests in the police department or other law enforcement agencies were to be physically expunged. United States v. Kalish, 271 F.Supp. 968 (D.P.R.1967), involved a situation where a criminal information was lodged against Kalish for failure to submit to induction in the army. But the matter was never prosecuted, because there had been a misunderstanding among branches of the Government. Kalish submitted to induction in the army and the criminal matter was dropped. The Court granted Kalish's application for an order directing the Justice Department officials to destroy all records of the arrest, and also ordered that no records or data regarding the matter should be transmitted to any other governmental agency or person. Wheeler v. Goodman, 306 F.Supp. 58 (W.D.N.C.1969), involved the arrests of hippies under the North Carolina vagrancy statute. In addition to holding that statute unconstitutional, the Court ordered that the arrest records be expunged. The Court stated (p. 66):

> "The existence of the records could harm plaintiffs unfairly, and this possibility suggests expunction where criminal investigation is not subserved in the least by retention of the files. We do not hold that expunction is appropriate every time a defendant is acquitted or released without prosecution, but on the facts of this case, including the youth of the plaintiffs, their innocence of any crime, the extreme misbehavior of the police in making arrests without probable cause, and the absence of any benefit to society in the maintenance of the arrest records, we think expunction should be allowed."

I believe that the reasoning in these decisions applies in the present case. I am mindful that there is a certain anomaly involved in directing records to be expunged. Certainly time cannot be turned back, and the facts about the arrests of November 5, 1966 cannot be erased. Moreover, there cannot be a total elimination of all written records relating to these arrests. For instance, the present litigation and the injunction to be issued herein will remain as a form of record of the incidents in question.

But the record in the present litigation, which explains the circumstances in detail and ends in a declaration of the invalidity of the arrests, is something substantially different from the regular records in the Criminal Court. The latter records can, and should be, expunged. It seems to me that, beyond the fact of the physical elimination of such records, there is a moral value in a court order directing that the matter be expunged.

██ One final point relates to the appropriateness of granting relief against that defendant who has been sued in his capacity as administrative Judge of the New York City Criminal Court. A judge exercising his judicial function is not liable under 42 U.S.C. § 1983, at least for damages. Pierson v. Ray, 386 U.S. 547, 553–555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). But in the present case, the relief to be granted against the Administrative Judge and the Chief Clerk of the Criminal Court will have no effect upon the exercise of the judicial function. Relief against these defendants is afforded solely because they maintain the remaining records of the invalid arrests perpetrated by the police officers, and the expungement of those records is necessary to afford complete relief in this case. Where, as here, there is no interference with any real judicial function, there is no immunity from suit under 42 U.S.C. § 1983. Law Students Civil Rights Research Council, Inc. v. Wadmond, 299 F.Supp. 117 (S.D.N.Y.1969), affirmed

(without reaching this question), 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971).

Plaintiffs are entitled to a declaratory judgment and injunction containing the following basic provisions:

(1) A declaration that the arrests of plaintiffs on November 5, 1966 were without cause and invalid;

(2) An order directing that defendants' remaining records of the arrests and charges shall be expunged and destroyed;

(3) An order prohibiting defendants from giving information to any law enforcement agencies, prospective employers, or other parties about the arrests and charges except, when appropriate and necessary, to advise of the declaratory judgment and injunction entered in this action.